UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHERYL PETRONE,                     )
                                    )
        Plaintiff,                  )     CIVIL ACTION NO.
                                    )     11-10720-DPW
v.                                  )
                                    )
LONG TERM DISABILITY INCOME         )
PLAN FOR CHOICES ELIGIBLE           )
EMPLOYEES OF JOHNSON & JOHNSON      )
AND AFFILIATED COMPANIES,           )
                                    )
        Defendant.                  )
                                    )

MEMORANDUM AND ORDER
March 27, 2013

Cheryl Petrone challenges the decision by the Johnson &
Johnson Corporate Benefits Department to deny her claim for
continued benefits under the Long Term Disability Income Plan for
Choices Eligible Employees of Johnson & Johnson and Affiliated
Companies (the "Plan"), an ERISA employee benefit plan. The
parties have filed cross-motions for summary judgment.

**I.  BACKGROUND**

Cheryl Petrone worked at DePuy Orthopaedics, Inc., a
subsidiary of Johnson & Johnson, as a Finish Operator, among
other jobs, for approximately seven years, from March 13, 2000
until June 7, 2007.

Ms. Petrone developed back pain around April 2007, and an
MRI revealed L5-S1 Disc Herniation.  She underwent back surgery,
a lumbar laminectomy, on July 2, 2007.  In October 2007, she was

diagnosed with radiculopathy and post-lumbar laminectomy syndrome, known as failed back syndrome.

She received short term disability benefits for 26 weeks beginning on her first day of absence from work due to her condition, June 9, 2007, and it continued through December 7, 2007.  During this time, Ms. Petrone applied for long term disability ("LTD") benefits.  Reed Group, a third-party claims service organization to which the Pension Committee delegated the responsibilities of administering benefit claims, approved Ms. Petrone's application on December 14, 2007, with benefits effective from December 8, 2007.  Her benefits continued until Reed Group denied her claim for continued LTD benefits effective January 12, 2009.

## A.    *The Long Term Benefits Plan*

Ms. Petrone's LTD Benefits are governed by the terms of the Long Term Disability Income Plan for Choices Eligible Employees of Johnson & Johnson and Affiliated Companies, in which Ms. Petrone has chosen to participate.

In relevant part, the LTD plan states that Ms. Petrone remains eligible for LTD benefits until she retires, begins to receive a pension, turns 65 years old, or dies, as long as she has "Total Disability."  Total Disability is defined as:

> the complete inability of the Participant, due to Sickness or Injury, to perform **any job** for which the Participant is (or may reasonably become) with or

2

without reasonable accommodation qualified by training, education or experience.  (emphasis in original).

The LTD Plan also specifies that failure to do any of the following constitutes grounds for termination of benefits "at the sole discretion of the Plan Administrator":

> (1) ... [C]ooperate with any other procedures, evaluation, investigation or audit in connection with this Plan . . . ,
>
> (3) cooperate with respect to the evaluation of a Participant's Total Disability or Continued Disability . . . .

The LTD Plan asserts that it was justified in denying Ms. Petrone's claim for continued benefits both as a clinical matter because her medical examinations reveal that she does not meet the definition of "Total Disability" and as an administrative matter for violation of the cooperation requirement.

## B.  *Clinical and Medical Examinations*

Over the course of her treatment and review for her condition, numerous doctors, therapists, and other professionals have either examined Ms. Petrone or her medical files.  The administrative record reflects that more than 12 different medical professionals have weighed in on Ms. Petrone's ability to return to work in any job.  Six concluded that Ms. Petrone was totally disabled and unable to work in any job (Marcovici, Worthington, Dominguez, McClusky, Bledsoe, and Parker); six concluded that she was capable of some level of work (Saris,

LeForce, Marion, Ferguson, DiTullio, and Trangle).  The following is a summary of the impressions and conclusions of the medical professionals.

### 1. Dr. Marcovici

Ms. Petrone met with Dr. Marcovici, one of her attending physicians, on numerous occasions for examinations and surgeries. It was Dr. Marcovici who performed Ms. Petrone's laminectamy on July 2, 2007.  Dr. Marcovici also performed the surgery to insert Ms. Petrone's spinal stimulator a year later.

In various follow-up examination reports, Dr. Marcovici continued to conclude that Ms. Petrone was completely disabled and incapable of performing sedentary work.  For instance, on June 17, 2008, he wrote "her pain is severe and disabling. . . . It is worse with activity and improved with rest. She has not had any significant relief since the onset of her symptoms over a year ago."  On September 2, 2008, Dr. Marcovici classified Ms. Petrone as "Class 5 - Severe limitation of functional capacity; incapable of minimal (sedentary) activity," although he acknowledged that she had "improved (some)."

### 2. Dr. Jeremy Worthington

On November 13, 2007, Dr. Worthington conducted a neurological examination finding that Ms. Petrone "has intractable pain in any position but lying down, she's able to stand and she's able to walk" and that as a result, "the patient

is unable to perform the responsibility for any job at this time."  Dr. Worthington also stated that "she has arachnoiditis which is a postoperative complication that may be associated with long-term pain and inability to work" and that "no definite timing can be established for the management of chronic pain of this type."

### 3. Dr. Eric Dominguez

Dr. Eric Dominguez is another of Ms. Petrone's attending physicians.  During this period, he met with Ms. Petrone many times, and has consistently maintained that Ms. Petrone is incapable of any work.  For instance, on the attending physician form he filled out for Reed Group, he classified Ms. Petrone as "Class 5 - Severe limitation of functional capacity; incapable of minimal (sedentary) activity," stating that she had "improved very little."

On January 29, 2009, Dr. Dominguez wrote a "To Whom it May Concern" letter, indicating that Ms. Petrone "is unable to work at the current time and I believe this will be the case for the foreseeable future."  Dr. Dominguez reaffirmed this assessment on April 14, 2009, when he filled out a detailed attending physician form indicating that Ms. Petrone was "unable to concentrate or focus on activities for prolonged periods because [of] either intense paid or opioid related effects," needs to be able to

stand and sit at will, and has other restrictions consistent with
work capacity below sedentary.

> ### 4. Catherine McClusky

Reed Group scheduled a Functional Capacity Evaluation
("FCE") for Ms. Petrone on November 25, 2008 with Catherine
McClusky, a Physical Therapist.  McClusky noted that Ms. Petrone
demonstrates

> the ability to perform jobs requiring a work level of
> .78 METS.  This energy equivalent falls below the
> Sedentary range of 1.5-2.1 METS.  It is felt that Ms.
> Petrone did not demonstrate maximum effort on this test
> as she was observed to walk faster to the treadmill and
> during push/pulling trials than she demonstrated on the
> treadmill.

As to the grip and pinch testing, Ms. McClusky also stated that,

> [n]o signs of maximum effort were noted during the grip
> and pinch dynamometry which decreases the test
> reliability.  It is my best clinical judgment that fair
> effort was demonstrated during most tasks.

Ms. McClusky concluded that Ms. Petrone's material handling
performance would fall in the **"'Sedentary' Physical Demands**
category," but that her "cardiovascular performance and inability
to sit for >3 minutes comfortably or stand in one place >10
minutes would place her as **'Below Sedentary'**" and therefore that
"Ms. Petrone did not demonstrate the ability to perform sedentary
work for 8 hours."  (emphasis in original).

Reed Group inquired "what the evaluator means by stating she
put forth a 'fair effort'.  Was she malingering?"  In response,
Ms. McClusky submitted an addendum to her report stating "it is

6

my best clinical judgment that *at least some degree of malingering was present during today's FCE.*" (emphasis in original).

### 5. Dr. Stephen Saris

Reed Group also scheduled an Independent Medical Evaluation ("IME") for Ms. Petrone on December 9, 2008, with neurologist Dr. Stephen Saris.

Dr. Saris noted that Ms. Petrone demonstrated "one of the Waddell signs of symptom exaggeration," but did not have "generalized over-reaction." He found that her mental status was normal, including orientation, memory, attention span and concentration. He noted that the success rate after surgery for patients with extruded disks is "extremely high, and unless someone has an adverse complication such as a diskitis, the surgery is curative and should leave no meaningful neurologic abnormality." Dr. Saris concluded that "[s]he has long since recovered from [her operation], and is ready to return to work without restrictions of any kind. Such a return would in no way be injurious to her health." He stated that his "only current diagnosis for her is left-sided pain without any meaningful objective abnormality."

### 6. Dr. Bruce LeForce

As a part of Reed Group's review of Ms. Petrone's first appeal from the denial of continued LTD benefits, Reed Group

engaged Dr. Bruce LeForce, a neurologist, to review Ms. Petrone's complete file on July 16, 2009.

Dr. LeForce noted that "[s]he has impairment on the basis of her lumbar laminectomy and the ongoing pain," but concluded that "based on the objective medical information provided for review, there is not documented evidence of functional limitations that would support an inability to work."  He placed particular emphasis on Dr. Saris's examination, stating

> The most recent examination by Dr. Saris on 12/09/2008 demonstrates normal strength. . . . The only objective abnormality noted was the absence of the left Achilles reflex. *These objective findings do not support an inability to work.*

(emphasis added).  He also made the specific findings that,

> she can sit, stand, or walk up to eight hours per day. She can lift and carry up to 20 pounds occasionally and up to 10 pounds frequently.  She can exert a negligible amount of force continuously.  She can operate controls with hands and feet.

### 7. *Dr. Phillip Marion*

Reed Group also arranged for Dr. Phillip Marion, a doctor who specializes in physical medicine and rehabilitation/pain management to review Ms. Petrone's file on July 16, 2009 as part of Ms. Petrone's first appeal.

Dr. Marion's report recounts an exhaustive summary of Ms. Petrone's medical examination history including (1) her many examinations and follow-up appointments with Drs. Worthington, Dominguez, and Marcovici between July 2007 and September 2008,

each of whom conclude at every examination that Ms. Petrone is unable to work in any capacity, (2) her November 2008 examination, in which physical therapist Catherine McClusky placed her below the sedentary occupation level, but notes that "some degree of malingering was present," and finally, (3) her December 2008 examination, in which Dr. Saris concluded "[s]he could return to her prior job without restrictions."  Dr. Marion stated that "she continues to complain of pain; albeit without correlated objective impairment" and "she remains otherwise functionally independent with activities of daily living, fully ambulatory and not restricted from driving a motor vehicle. There is also no report of any specific cognitive deficits."

He acknowledged the discrepant findings of previous examiners, but concluded that there remains no objective impairment:

> Various medical evaluations and file reviews provide varying conclusions from no occupational restrictions to below sedentary (with evidence of malingering). From a physical medicine and rehabilitation/pain management perspective, there remains no objective impairment precluding her from performing at least at the light capacity occupational level on a full time basis.

### 8. David Bledsoe

On September 24, 2009, Ms. Petrone submitted to Reed Group a report by occupational therapist David Bledsoe, questioning some of the conclusions that Ms. McClusky drew in her FCE.

Mr. Bledsoe took particular issue with Ms. McClusky's "casual" use of the term malingering.  He stated that "[m]alingering first of all is a diagnosis.  It is not one that a therapist routinely offers.  Physical therapists at times can offer a differential diagnosis, but to state 'malingering' from 2 casual observations is inappropriate."  Mr. Bledsoe goes on to indicate that Ms. McClusky did not have enough evidence to make a malingering diagnosis, and that she had omitted the fact that Ms. Petrone "had such difficulty with the treadmill assessment that her companion (Susie) had to actually 'catch' her."  He concluded that Ms. McClusky's original FCE opinion was the accurate one.

### 9. Gretchen Ferguson

After Reed Group denied Ms. Petrone's initial appeal, and Ms. Petrone filed a final appeal, Reed Group scheduled a new FCE with Gretchen Ferguson, a physical therapist with Novacare Rehabilitation, for November 16, 2009.

Ferguson noted that Ms. Petrone was "cooperative throughout testing" although "[s]he demonstrated self limiting behavior during the lift testing . . . ."  She demonstrated the capacity for "occasional sitting, frequent walking, crawling . . . and constant standing."  From this, Ms. Ferguson concluded that Ms. Petrone was "functionally capable of work at a light physical demand level on a 8 hour per day basis according to U.S.

Department of Labor Standards. . . . Her Aerobic capacity is
undeterminable due to an incomplete test."

       *10. Dr. Michael DiTullio, Jr.*

Also as part of Ms. Petrone's final appeal, Reed Group
scheduled an IME with Dr. Michael DiTullio, Jr., a specialist in
physical medicine/rehabilitation, which took place on November
30, 2009.

Dr. DiTullio recounted an exhaustive review of Ms. Petrone's
examination and medical history leading up to and resulting from
her laminectomy.  He also conducted his own examination and
determined that "she demonstrates a 10% impairment of the whole
person" and that "she has reached maximum medical improvement and
there is no role for further therapeutic interventions."  From
this, he concluded that "Ms. Petrone should be able to
participate in an eight-hour-per-day sedentary position" as long
as she "avoid[s] those activities which would involve lifting
over 20 pounds, prolonged postural fixation, repetitive bending
or excessive spinal loading."

Dr. DiTullio also submitted an addendum to his IME after
reviewing additional material that Ms. Petrone supplied.  He
determined that the additional documentation did not alter the
opinions and conclusions of his original report.

### 11. Dr. Kevin Trangle

Reed Group submitted the entire claim file, including additional information that Ms. Petrone submitted over the course of her correspondence with Reed Group and the Corporate Benefits Committee, to Dr. Kevin Trangle, who issued his report on January 25, 2010.

Dr. Trangle recounted Ms. Petrone's medical history, extending back to conditions predating the back pain and subsequent laminectomy, and extending forward to a vocational assessment on January 5, 2010.  His recitation included brief summaries of sworn statements by Ms. Petrone herself, her partner, Suzanne Wood, and her sister, Ann Petrone.

In Dr. Trangle's analysis,

> The actual left-sided disc protrusion was much reduced compared to the pre-operative situation.  Another MRI scan . . . done after surgery . . . showed that there was resolution of the enhancement and granulation tissue on the . . . nerve roots.  There was only a small central left-sided disc protrusion noted.  This indicated at least anatomically, functionally and imagine-wise, an improvement of her situation based upon surgery and recession of the scar tissue.

> She, nonetheless, continued to have complaints which necessitated more treatment.

Dr. Trangle concluded, "based upon this information, upon numerous examinations, consistent findings among Independent Medical Examiners and consistent evidence of either malingering symptom magnification . . . , Ms. Petrone, is capable of doing light work."

Dr. Trangle appears to have (1) misread Catherine McClusky's FCE, stating that she concluded Ms. Petrone was able to work in a sedentary capacity when, in fact, she placed Ms. Petrone below the threshold for sedentary work, and (2) slightly exaggerated Dr. Saris's observation of only a single Waddell sign of symptom magnification as "Dr. Saris . . . opined that she had symptom magnification and positive Waddell signs as well as positive distraction test [sic]."  However, Dr. Trangle does not appear to have placed any special weight on those reports in arriving at his conclusion.

Dr. Trangle also filed an addendum to his report after reviewing further materials that Ms. Petrone submitted, but his opinion remained unchanged.

### 12. *James Parker*

On January 5, 2010, an independent vocational consultant retained by Ms. Petrone's counsel, reviewed Ms. Petrone's medical and examination records and conducted an interview with Ms. Petrone by telephone.

Parker opined that in denying Ms. Petrone's claim, Reed Group had not "acknowledged the exertional and non-exertional impairments and functional limitations established by Dr. Dominguez and others that preclude [her] from performing any work on a regular and sustained basis."  Parker noted that the limitations on Ms. Petrone's ability to sit, stand or walk

precludes her ability to do sedentary work, which "require[s] sitting for extended periods of time," and the frequency with which she would need to be absent from work "due to pain and related functional limitations . . . would not be tolerated by any employer in any work environment."  He therefore concluded that "Ms. Petrone is totally disabled from all employment."

## C.   *Procedural History*

Ms. Petrone began receiving short term disability benefits on June 9, 2007.  Her long term disability benefits began on December 8, 2007.

Reed Group initially denied Ms. Petrone's claim for continued LTD benefits by a letter dated December 16, 2008, which became effective January 12, 2009.

Ms. Petrone appealed the initial denial of her claim for continued LTD benefits by a letter dated June 8, 2009.  Reed Group acknowledged her appeal by a letter dated June 10, 2009, but ultimately denied the appeal on July 24, 2009.

Meanwhile, the Social Security Administration granted Ms. Petrone's request for Social Security Disability Income ("SSDI") by a six-page decision dated August 19, 2009.  The Administrative Law Judge found, among other things, that Ms. Petrone (1) had "severe impairment of her ability to concentrate and persist at tasks due to her pain," and was "unable to lift or carry more than 10 pounds occasionally, do any postural activities or

perform prolonged sitting, standing or walking," (2) could not transfer any acquired work skills to another job, (3) could not perform any job "that exist[s] in significant numbers in the national economy."

Ms. Petrone filed her final appeal of her LTD benefits claim on September 22, 2009, as acknowledged by a September 24, 2009 letter from the Plan.  The Plan notified Ms. Petrone on October 28, 2009, that it would require more information in order to evaluate Ms. Petrone's final appeal because ERISA regulations require an administrator to consult medical professionals who were not involved in the previous determination in making a decision regarding the appeal.  *See* 29 C.F.R. § 2560.503-1(h)(iii)-(v).

Over the course of the next several months, until April 4, 2010, the parties exchanged numerous letters containing or attaching evidence, evaluations, and questions regarding Ms. Petrone's appeal.  Finally, on April 27, 2010, Richard McDonald, issued a 22-page letter constituting the Plan's Final Determination, denying Ms. Petrone's appeal.  Ms. Petrone thereupon filed her Complaint with this Court one year later on April 26, 2011.

## II.  STANDARD OF REVIEW

Summary judgment in the ERISA context differs significantly from summary judgment in an ordinary civil case.  The usual

15

factual inferences in favor of the non-moving party do not apply,[1] and "in a very real sense, the district court sits more as an appellate tribunal than as a trial court.  It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary."  *Leahy* v. *Raytheon Co.*, 315 F.3d 11, 17-18 (1st Cir. 2002).

Under Supreme Court caselaw, "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co.* v. *Bruch*, 489 U.S. 101, 115 (1989).  If, however, "the ERISA plan grants the plan administrator discretionary authority in the determination of eligibility for benefits, the administrator's decision must be upheld unless it is arbitrary,

---

[1] The First Circuit has not been entirely consistent in its articulation of this point of law.  *Compare Gent* v. *CUNA Mut. Ins. Society*, 611 F.3d 79, 82-83 (1st Cir. 2010)("[W]e typically view the record evidence in the light most favorable to the non-moving party . . . . Our approach is different, however, in the ERISA benefit denial context . . . ." (citations omitted)) *and Orndorf* v. *Paul Revere Life Ins. Co.,* 404 F.3d 510, 517 (1st Cir. 2005) ("[T]he non-moving party is not entitled to the usual inferences in its favor.") *with Wright* v. *R.R. Donnelley & Sons Co. Grp. Benefits Plan*, 402 F.3d 67, 74 (1st Cir. 2005) ("The operative inquiry . . . is whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits." (quotations omitted)).

capricious, or an abuse of discretion." *Wright* v. *R.R. Donnelley & Sons Co. Grp. Benefits Plan,* 402 F.3d 67, 74 (1st Cir. 2005) (internal citation and quotation omitted).

## A.    *Delegation of Discretion*

In this case, Ms. Petrone asserts that the Plan bears the burden of supporting its position under the less deferential *de novo* review.  However, she makes no argument herself in favor of *de novo* review, and, in fact, concedes that "there is appropriate language in the J&J LTD Plan granting discretionary authority to Mr. McDonald to make benefit decisions."  Correspondingly, I apply the more deferential abuse of discretion standard here.

The record in this case supports Ms. Petrone's effective concession that the LTD Plan has appropriately vested Mr. McDonald with the discretion to make benefit decisions. According to the LTD Plan, the Pension Committee, which is the Plan Administrator and fiduciary may "[e]xercise its discretion to determine eligibility for benefits, to construe and interpret the provisions of the Plan and to render conclusive and binding decisions and determinations based thereon . . . including without limitation adjudication of all claims and claims appeals."  The Pension Committee has "[d]elegated its authority," to review and decide LTD benefits claims and appeals to Johnson & Johnson's Corporate Benefits Department.  Mr. McDonald, who issued the Plan's Final Determination, is the Director of

Corporate Benefits for Johnson & Johnson and a member of the
Pension Committee.  This suffices to show that the LTD Plan gave
Corporate Benefits and Mr. McDonald, acting on behalf of
Corporate Benefits, "discretionary authority to determine
eligibility for benefits or to construe the terms of the plan."
Therefore, the Final Determination "will not be disturbed if
reasonable."  *Conkright* v. *Frommert*, 130 S. Ct. 1640, 1651 (2010)
(citation and quotation omitted).

## B.   *Conflict of Interest*

In an ERISA disability claim denial case, such as this one,
the abuse of discretion standard is flexible when there is a
potential for conflict of interest.  In *Metropolitan Life Ins.
Co.* v. *Glenn*, the Supreme Court held that when a "plan
administrator both evaluates claims for benefits and pays
benefits claims[, this] creates the kind of 'conflict of
interest'" courts must factor in to their analysis.  554 U.S.
105, 112, 115 (2008); *see also Wallace* v. *Johnson & Johnson*, 585
F.3d 11, 15 n.2 (1st Cir. 2009) ("The deference may be less
generous where the deciding entity has a financial stake in the
outcome . . . .").  This does not alter the standard of review
itself.  *Conkright*, 130 S. Ct. at 1646 ("A deferential standard
of review remains appropriate even in the face of a conflict.");
*Cusson* v. *Liberty Life Assur. Co. of Boston*, 592 F.3d 215, 224
(1st Cir. 2010).  Instead, the court must "[t]emper the abuse of

18

discretion standard with skepticism 'commensurate' with the conflict." *Nolan* v. *Heald College*, 551 F.3d 1148, 1153 (9th Cir. 2009).

A conflict is "more important . . . where circumstances suggest a higher likelihood that it affected the benefits decision." *Glenn*, 554 U.S. at 117.  On the other hand, the conflict "prove[s] less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy." *Id.*  Such steps may include "employing a neutral, independent review process, or segregating employees who make coverage decisions from those who deal with the company's finances." *Harlick* v. *Blue Shield of Cal.*, 686 F.3d 699, 707 (9th Cir. 2012) (quoting *Glenn*, 554 U.S. at 117).

The Plan asserts that there can be no conflict of interest in this case because the entity administering the plan is not also responsible for paying benefits under the plan.  Indeed, the interpretation and review of LTD Plan claims appeals is the responsibility of the Johnson & Johnson Corporate Benefits Department, which, like the Pension Committee that administers claims in the first instance, engages Reed Group, an independent claims service organization, to coordinate and administer much of the factual and evidentiary development.  However, neither Johnson & Johnson, nor Reed Group funds the Plan.  The Plan is

funded by employee contributions deposited in the Johnson &
Johnson Voluntary Employee Benefit Trust.  Notwithstanding, Ms.
Petrone makes three arguments to demonstrate a conflict of
interest: (1) a claimant's qualification as "Totally Disabled"
under the LTD Plan entitles her to benefits distinct from LTD
benefits (such as dental, medical and vision benefits) paid by
the claimant's immediate employer, a subsidiary of Johnson &
Johnson.  Therefore Johnson & Johnson, as the ultimate parent,
can save the costs of paying such benefits by denying claims
under the LTD Plan; (2) the Trust is insured by Prudential and
its funds are "co-mingled" with the Johnson & Johnson Voluntary
Employee Benefits Trust.  Therefore the Trust does not fund the
LTD Plan alone, but rather leaves open the possibility of a
financial conflict of interest with the other entities; and (3)
the Court cannot make an informed decision absent discovery
regarding the funding status of the Trust and Mr. McDonald's
compensation.  I find the potential for conflict of interest here
is so attenuated to be of little true concern.  Ultimately, none
of these theories establishes a cognizable conflict of interest.

   *1. Collateral Benefits*

   Under the LTD Plan, a claimant "considered disabled as
defined by the Choices Long Term Disability Plan and Reed Group"
is entitled to maintain a variety of "other plan benefits" such
as "Medical, Dental, and/or Vision," "Term Life Insurance," and

24-Hour Accident Insurance, among others.  This is true "[e]ven if [the claimant is] not enrolled in the LTD Plan."  Ms. Petrone asserts that although the LTD Plan itself is funded by employee contributions, "Johnson & Johnson can save substantial sums by terminating LTD Benefit claims" due to these collateral benefit obligations.

A problem with this argument is that Johnson & Johnson does not, itself, fund these collateral benefits.  Instead, "'company costs' for [these] other benefits are paid through a 'charge back' mechanism by the individual operating company that employs the affected individual," in Ms. Petrone's case, DePuy Orthopaedics.  Ms. Petrone does not challenge this fact, but argues that for ERISA purposes, Johnson & Johnson and DePuy Orthopaedics are considered a single employer under 26 U.S.C. § 414(b), because they are "corporations which are members of a controlled group of corporations" and because Johnson & Johnson lists itself as a single employer in its forms 5500, filed with the Department of Labor.  Ms. Petrone's contentions on this point are unpersuasive.

The statute that Ms. Petrone cites, 26 U.S.C. § 414(b), is expressly limited; it is only for "purposes of sections 401 [qualified pension, profit-sharing, and stock bonus plans], 408(k) [and] 408(p) [individual retirement accounts], 410 [minimum participation standards], 411 [minimum vesting

standards], 415 [limitations on benefits and contribution under qualified plans], and 416 [special rules for top-heavy plans]." *Id.* By its own terms, § 414(b) does not apply to the statute pursuant to which Ms. Petrone brings this case: 29 U.S.C. § 1132(a)(1)(B) for civil enforcement "to recover benefits due . . . under the terms of [the] plan."

By the same token, companies file Forms 5500 pursuant to ERISA Sections 104 and 4065 (29 U.S.C. §§ 1024, 1365) where "single-employer plan" is intended to distinguish plans administered by a "single" corporation from a multiemployer plan to which "more than one employer is required to contribute. . . [and] which is maintained pursuant to one or more collective bargaining agreements . . . ." 29 U.S.C. § 1002(37)(A). This "single-employer" designation on the forms 5500 does not apply to § 1132(a)(1)(B) and does not justify finding that Johnson & Johnson is directly responsible for funding Ms. Petrone's collateral benefits. Rather, by requiring the claimant's direct employer to cover the costs of collateral benefits while the ultimate parent takes responsibility for adjudicating the claims, the Plan has taken steps to "segregat[e] employees who make coverage decisions from those who deal with the company's finances." *Harlick*, 686 F.3d at 707. Under these circumstances, the conflict "prove[s] less important (perhaps to the vanishing point)." *Glenn*, 554 U.S. at 117.

22

Furthermore, an employee remains eligible for these collateral benefits "even if [she is] not enrolled in the LTD Plan" provided she is "considered disabled as defined by the Choices Long Term Disability Plan and Reed Group."  Under an administrative denial of an LTD Plan claim, the claimant may still be entitled to the collateral benefits if she meets the clinical definition of "disabled."  Only a clinical denial could guarantee that no Johnson & Johnson entity remains liable for these collateral benefits.  Thus, these collateral benefits do not create a cognizable conflict of interest regarding the LTD Plan's administrative denial of Ms. Petrone's claim.  To the extent that potential savings from denial of these collateral benefits creates any conflict of interest for the LTD Plan administrators, it can only affect the portion of the denial based on medical grounds.

That said, I recognize that Johnson & Johnson, as the ultimate parent, has a financial interest in its subsidiary, DePuy Orthopaedics.  A parent-subsidiary relationship between the decision maker and the financier may provide some cause for concern.  *See Leon* v. *Quintiles Transnational Corp.*, 300 F. App'x 558, 559 (9th Cir. 2008) (finding a structural conflict of interest where the claims administrator was also a subsidiary of the plan's funding source).  However, this potential conflict is attenuated "perhaps to the vanishing point" by the steps Johnson

23

& Johnson has taken to segregate the relevant actors.  In any event, I view the Plan's decision with skepticism "commensurate" to the potential conflict of interest.  *Nolan*, 551 F.3d at 1153.

> ### 2. Johnson & Johnson Voluntary Employee Benefit Trust

In 2009, the First Circuit noted, describing the same plan at issue in this case, that there was no conflict of interest where "the Plan is funded by employee contributions-not those of Johnson & Johnson."  *Wallace* 585 F.3d at 15 n.2.  Ms. Petrone nevertheless questions the independence of the trust because the LTD Plan purchased insurance, and therefore Prudential Insurance Company of America may also be liable for certain new claims arising after January 1, 2009.  This does not, however, affect the independence of the LTD Plan with respect to Ms. Petrone's claim.  Her claim arose in 2007 upon her initial disability and inability to perform her job.  The initial denial of her continued LTD benefits occurred in December 2008, one month before the operative date of the Prudential insurance.  Even if the Trust's purchase of insurance could undermine the independence of the LTD Plan's funding, it could not affect an administrator's decision regarding Ms. Petrone's claim because her claim is not covered.  The fact that the trust purchased insurance also does nothing to undermine the fact that the *source* of funding, the employees, remains separated from the *administration* of the Plan, by Johnson & Johnson.

Equally unavailing is Ms. Petrone's attempt to undermine the independence of the Trust because its funds are "co-mingled" with those of the Johnson & Johnson Voluntary Employee Benefit Trust. Ms. Petrone argues that Johnson & Johnson's Forms 5500 demonstrate co-mingling of funds between the LTD trust and the VEBA trust for medical benefits.  But the same Forms 5500 set out the LTD Plan's investments in detail, demonstrating separate accounts for each plan under the master trust.  The administration of two accounts under a single master trust does not give rise to a conflict of interest in the administration of claims funded by one of the two accounts.

### 3. Request for Further Discovery

During the course of her appeal, Ms. Petrone inquired regarding the adequacy of the funding in the Trust for the LTD Plan.  Mr. McDonald replied on behalf of Corporate Benefits, stating "[t]he Plan is funded by employee contributions, and therefore no benefits are paid out of Johnson & Johnson's general assets.  Moreover, Johnson & Johnson is under no obligation to fund the Plan should it become insolvent."  Unsatisfied with this response, Ms. Petrone argues, without further explanation, that a Plan supported by an under-funded trust is more likely to deny a claim than one supported by an adequately funded trust.  This argument assumes what it seeks to prove: that a potentially

underfunded trust here undermines the independence of an unrelated Plan administrator.

The First Circuit has cautioned against permissive use of discovery in ERISA benefit denial cases. *Liston* v. *Unum Corp. Officer Sev. Plan*, 330 F.3d 19, 23 (1st Cir. 2003) ("[S]ome very good reason is needed to overcome the strong presumption that the record on review is limited to the record before the administrator."). "In some cases, a good reason has been found to exist when a party makes a colorable claim of bias." *Denmark* v. *Liberty Life Assurance Co. of Boston*, 566 F.3d 1, 10 (1st Cir. 2009). However, Ms. Petrone's unsubstantiated conjecture that the Trust might not be adequately funded and that such potential inadequate funding might make claim denials more likely is not the kind of colorable claim of bias sufficient to "overcome the strong presumption" against discovery. *Liston*, 330 F.3d at 23.

Ms. Petrone's next suggestion is no more colorable. She argues that this Court cannot make a reasoned judgment in the absence of discovery into Mr. McDonald's "compensat[ion], how his performance is linked to cost savings, and the total cost of providing collateral benefits under the J&J LTD Plan" because "Mr. Johnson [sic] is likely to curry favor with his employer [Johnson & Johnson] by holding down the costs of the[] other benefits." Yet Ms. Petrone points to no evidence, and she does not articulate any colorable theory to indicate that Mr.

McDonald's compensation or performance might somehow be linked to the number of claims he denies.  This is not the kind of "colorable claim of bias" that might constitute a "good reason" to set aside the presumption against discovery.  *Denmark*, 566 F.3d at 10.  I decline to sponsor a fishing expedition in the absence of some reason to suspect that discovery might lead to meaningful evidence of a conflict of interest.

In applying the "abuse of discretion" standard in this case, I bear in mind that Johnson & Johnson, as the ultimate parent of DePuy Orthopedics, Inc., may indirectly save certain collateral costs associated with a finding of disability in the case of a purely administrative denial of Ms. Petrone's claim, but I bring to bear only the skepticism "commensurate" to the attenuated potential for conflict of interest.  *Nolan*, 551 F.3d at 1153.

### III.  DISCUSSION

The Plan's Final Determination letter, which Ms. Petrone challenges in this action, states two independent grounds for denial of Ms. Petrone's claim: first, the clinical ground that Ms. Petrone does not meet the LTD Plan's definition of "Total Disability" because she is not incapable of performing "any job" for which she is or may reasonably become qualified, and second, the administrative ground that she failed to "cooperate with [the] procedures, evaluation, investigation or audit in connection with th[e] Plan."  The Plan abused its discretion in

determining that Ms. Petrone does not qualify as "Totally Disabled" by ignoring or failing to address meaningfully substantial evidence in the record running contrary to the Plan's determination.   Moreover, its administrative denial construing Ms. Petrone's failure to cooperate appears to be an abuse of the Plan's discretion as well.

## A.   *The Clinical Rationale for Claim Denial*

Under the applicable abuse of discretion standard, Richard McDonald's final determination on behalf of the Corporate Benefits Department "must be upheld if there is any reasonable basis for it."   *Morales-Alejandro* v. *Medical Card Sys., Inc.,* 486 F.3d 693, 698 (1st Cir. 2007).   It is axiomatic that in abuse of discretion review, "a court is not to substitute its judgment for that of the [decision maker]."   *Motor Vehicle Mfgrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto Ins.,* 463 U.S. 29, 43 (1983); *see also Terry* v. *Bayer Corp.,* 145 F.3d 23, 40 (1st Cir. 1998) (incorporating the *State Farm* rule to the ERISA benefit context). Rather all that is required is that "the administrator's decision . . . be . . . reasoned and supported by substantial evidence in the record."   *Vlass* v. *Raytheon Employees Disability Trust*, 244 F.3d 27, 30 (1st Cir. 2001).

The Administrative Record contains substantial evidence that Ms. Petrone may not meet the LTD Plan's definition of "Total Disability."   Saris, LeForce, Marion, Ferguson, DiTullio, and

Trangle all concluded that Ms. Petrone was capable of at least "sedentary" work, some concluded that she may be capable of "light" work, and Dr. Saris concluded that she may have been able to return to her former job without functional limitations of any kind.  Mr. McDonald's Final Determination letter quotes this evidence at length.  However, even under an abuse of discretion standard, this does not end the inquiry.  The Administrative Record also contains evidence that Ms. Petrone was incapable of performing "any job" and therefore "Totally Disabled" under the LTD Plan.  Marcovici, Worthington, Dominguez, McClusky, Bledsoe, and Parker each concluded that Ms. Petrone's disability prevented her from performing even "sedentary" work.  Moreover, an Administrative Law Judge for the Social Security Administration issued a decision "fully favorable" to Ms. Petrone, finding her "disabled" under 42 U.S.C. §§ 216(I), 223(d).  Furthermore, Ms. Petrone; Ms. Petrone's sister, Ann Petrone; and Ms. Petrone's partner, Suzanne Wood, each submitted sworn statements regarding the debilitating extent of Ms. Petrone's limitations.  Mr. McDonald does not discuss most of this contrary evidence in the Final Determination letter.

Of course, "the existence of contradictory evidence does not, in itself, make the administrator's decision arbitrary," *Vlass*, 244 F.3d at 30, but the administrator cannot simply ignore contrary evidence, or engage with only that evidence which

supports his conclusion. *See Winkler* v. *Metro. Life Ins. Co.*, 170 F. App'x 167, 168 (2d Cir. 2006) ("An administrator . . . may not, as MetLife did here, cherry-pick the evidence it prefers while ignoring significant evidence to the contrary."); *Love* v. *Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 397-98 (7th Cir. 2009) ("[P]lan administrators . . . may not simply ignore . . . medical conclusions or dismiss . . . conclusions without explanation.") (internal citations omitted).

Of the contrary evidence contained in the Administrative Record, the Final Determination letter essentially only addresses (1) the sworn statements Cheryl Petrone, Ann Petrone, and Suzanne Wood and (2) Mr. James Parker's vocational assessment.  As to this evidence, the Final Determination letter reasonably concludes that "[w]hile statements by Ms. Petrone's sister and roommates have been considered, we have determined that such anecdotal evidence is of less weight than the observations of trained professionals."  The letter also devotes considerable analysis to the weaknesses of Mr. Parker's vocational assessment, stating that he mischaracterizes certain reports that he relies on, makes unsupported claims, and misunderstands the requirements of "Total Disability" under the plan.  Whether I agree with these determinations is immaterial.  The Plan has made a reasoned determination supported by the record that this evidence lacks

probative value.  That suffices under the abuse of discretion standard of review.

However, the Final Determination letter fails meaningfully to address (1) Dr. Marcovici's Attending Physician Statement classifying Ms. Petrone as "Class 5 - Severe limitation of functional capacity; incapable of minimal (sedentary) activity;" (2) Dr. Worthington's report and conclusion that "the patient is unable to perform the responsibility for any job at this time;" (3) Dr. Dominguez's reports and conclusions that Ms. Petrone "is unable to work at the current time and I believe this will be the case for the foreseeable future," and his Attending Physician Statement also classifying her as "Class 5;" (4) Catherine McClusky's ultimate conclusion in her FCE that "Ms. Petrone did not demonstrate the ability to perform sedentary work for 8 hours;" and (5) the Social Security ALJ's determination that she is disabled.

### 1. Failure to Address Adverse Medical Evidence

The Final Determination letter fails even to mention, let alone dispute, Dr. Marcovici's and Dr. Worthington's conclusions. It lists Dr. Marcovici's Attending Physician Report among the documents considered, states that the ALJ relied on his assessment, and quotes Dr. Saris's IME, which briefly mentions that Dr. Marcovici performed Ms. Petrone's surgery and diagnosed her with possible reflex sympathetic dystrophy.  But nowhere does

the Final Determination mention that he classified her as "incapable of minimal (sedentary) activity."  Similarly, the Final Determination makes no mention of Dr. Worthington's conclusion that "the patient is unable to perform the responsibility for any job at this time."  The only reference to Dr. Worthington at all appears in a lengthy quotation from Dr. Saris's IME, unrelated to any conclusion regarding Ms. Petrone's ability to work, in which Dr. Saris states "Dr. Worthington commented on asymmetry of her calf muscles, and I measured them carefully and she has neither atrophy nor fasciculation nor weakness at this time."

The letter frequently mentions Dr. Dominguez, yet it never mentions Dr. Dominguez's January 29, 2009 letter stating that she is "unable to work . . . for the foreseeable future," nor his Attending Physician Statement classifying her as "incapable of minimal (sedentary) activity."

The Defendant correctly argues that it owes no special deference to Drs. Marcovici, Worthington, and Dominguez as Ms. Petrone's attending physicians.  *See Richards* v. *Hewlett-Packard Corp.*, 592 F.3d 232, 240 (1st Cir. 2010); *see also Black & Decker Disability Plan* v. *Nord*, 538 U.S. 822, 832 (2003).  But it is an abuse of discretion to ignore their evidence entirely.  *Love*, 574 F.3d at 397-98 (7th Cir. 2009) ("While plan administrators do not owe any special deference to the opinions of treating physicians,

they may not simply ignore their medical conclusions or dismiss
those conclusions without explanation.").

### 2. *Failure to Address McClusky's Functional Capacity Evaluation*

The Final Determination letter does mention Catherine
McClusky's report, but does not meaningfully address her
conclusion, which does not support denial of Ms. Petrone's
appeal.  The letter notes that "[McClusky] concluded that Ms.
Petrone was not capable of sedentary work based on her
cardiovascular performance, about which she had noted suboptimal
effort, and sitting/standing limitations."  It also notes that
Dr. Saris's opinion, finding "no functional impairment and no
disability," contradicts Ms. McClusky's conclusion and
characterizes Dr. Saris's opinion as "definitive."  One might
infer from the letter that the Plan believes that any conclusions
drawn, even in part, from tests in which Ms. McClusky noted
"suboptimal effort" are invalid because Ms. Petrone did not
exhibit the required engagement with the test's requirements.
However, Ms. McClusky does not so limit her conclusions herself.
Adopting invalidity by implication without addressing Ms.
McClusky's conclusion is also an abuse of discretion.

### 3. *Reliance on Dr. Saris's Report*

The LTD Plan's heavy reliance on Dr. Saris's IME (1) as
affirmative evidence of Ms. Petrone's capacity to work, (2) to
address Ms. McClusky's conclusion, and (3) as the only

substantive mention of Drs. Marcovici and Worthington, is not sufficient to justify systematically failing to engage with adverse evidence.  First, Dr. Saris supports his conclusion, in part, by explaining that success rates for the kind of surgery Ms. Petrone underwent are "extremely high, and unless someone has an adverse complication such as a diskitis, the surgery is curative and should leave no meaningful neurologic abnormality." However, the percentage of successful surgeries is of no moment if Ms. Petrone, herself, has suffered some disabling residual effect.  More fundamentally, of the more than 12 doctors to examine Ms. Petrone, all but Dr. Saris concluded that she would be limited to, at most, "light" work.  Dr. Saris, by contrast, contended that "[s]he has long since recovered from [her operation], and is ready to return to work without restrictions of any kind.  Such a return would in no way be injurious to her health."  Absent some compelling explanation for this stark inconsistency with all of the other evidence of record, it is unreasonable to use Dr. Saris's single report to discredit all of the other consistent evidence in support of Ms. Petrone's disability claim.  It is an abuse of discretion to credit a report with such "palpable bias in favor of rejecting the claim." *Conrad* v. *Reliance Standard Life Ins. Co.*, 292 F. Supp. 2d 233, 238-39 (D. Mass. 2003).  Dr. Saris's approach evidences such bias.

### 4. Failure to address the Social Security ALJ Decision Meaningfully

The Plan required Ms. Petrone to apply for Social Security Disability benefits as a condition of the Plan.  Yet, the Final Determination letter purports to dispose of the ALJ's favorable decision on three bases, stating that it (1) is not binding on the LTD Plan, (2) relied on different medical evidence of Ms. Petrone's conditions, and (3) was based on a different definition of disability.  The Plan does not distinguish the substance of the medical evidence underlying the ALJ's decision, despite the fact that it is also identified in the Administrative Record.

The Plan is, of course, correct that the Social Security Administration's decision is not binding, *see Boardman* v. *Prudential Ins. Co. of Amer.*, 337 F.3d 9, 14 n.4 (1st Cir. 2003) ("[I]t is well-established that 'benefits eligibility determinations by the Social Security Administration are not binding on disability insurers.'") (quoting *Cook* v. *Liberty Life Assurance Co.*, 320 F.3d 11, 16 n.5 (1st Cir. 2003)).  But the reasoning of the Social Security Administration's determination cannot simply be ignored.  *See id.* at 398 ("SSA determinations are *often instructive* but they are not determinative.") (emphasis added); *see also Montour* v. *Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 636 (9th Cir. 2009) ("[A] proper acknowledgment of a contrary SSA disability determination would entail comparing and contrasting not just the definitions employed but also the

35

medical evidence upon which the decisionmakers relied."). The ALJ's decision is further record evidence of Ms. Petrone's disability and a reasonable determination must address the substance of the decision, not merely whether it is binding.

That the ALJ relied on different evidence than that before the Corporate Benefits Committee deciding Ms. Petrone's appeal does not absolve the Committee of the responsibility to address the evidence that the ALJ did consider, such as assessments from Drs. Marcovici and Dominguez. *See id*. This is especially true because the Final Determination letter ignores this same evidence in the Plan's own administrative record. *Supra* Section III(A)(1). Different evidence does not necessarily lead to a different determination. Therefore, the Plan abused its discretion by arbitrarily deciding that the differing evidence before the ALJ rendered his decision irrelevant to Ms. Petrone's appeal.

Finally, the Plan distinguishes the definition of "Total Disability" in the LTD Plan: "the complete inability of the Participant, to perform **any job** for which the Participant is (or may reasonably become) . . . qualified" (emphasis in original), from the definition of disability for purposes of the Social Security Administration: "the inability to engage in **any substantial gainful activity**." 20 C.F.R. § 404.1505(a) (emphasis added). In the First Circuit, a Social Security Administration

decision "should not be given controlling weight . . . except perhaps in the rare case in which the statutory criteria are identical to the criteria set forth in the insurance plan." *Pari-Fasano* v. *IIT Hartford Life & Accident Ins. Co.*, 230 F.3d 415, 420 (1st Cir. 2000); *Richards* v. *Hewlett-Packard Corp.*, 592 F.3d 232, 240 (1st Cir. 2010).

In *Richards*, the Court rejected the claimant's argument of comparability because the SSA's determination provided that the claimant "retains the residual functioning capacity for *less than a full range* of sedentary work activity" while under his plan, he must prove that "he is disabled from *all* sedentary work." *Richards*, 592 F.3d at 240 (emphasis in original).  However, in this case, the definitions are much more closely aligned.  The SSA found that Ms. Petrone is unable "to engage in **any substantial gainful activity**" (emphasis added) and the Plan requires that she be unable "to perform **any job**," (emphasis in original).  Although the wording is different, the Defendant articulates no meaningful difference between these standards. The Final Determination letter identifies the semantic difference between "job" and "gainful activity," and notes that the SSA must take age into account, whereas the Plan need not.  The plan does not explain how "job" is different from or somehow to be distinguished from  "gainful activity."  While these definitions may appear semantically distinct, they are functionally

identical.  *Cf. Ladd* v. *ITT Corp.*, 148 F.3d 753 (finding "unable
to engage in any and every duty pertaining to any occupation or
employment for wage or profit for which you are qualified, or
reasonably qualify by training, education or experience" to be
"the same thing as under the social security disability
program").  I find the LTD Plan's analysis of the ALJ's decision
arbitrary and capricious in its failure to engage with the
evidence developed in the SSA proceeding, particularly in light
of the comparability of the standards applied in the two
proceedings.

Although the LTD Plan addresses some of these sources of
contrary evidence in its own 56.1 statement of uncontroverted
facts and its response to Ms. Petrone's 56.1 statement, that is
too little too late.  This case is a challenge to the LTD Plan's
denial of her final appeal in the Final Determination letter
under § 1132(a)(1)(B), and the letter fails to provide any
reasonable justification for disregarding voluminous
contradictory evidence.[2]

-------------------

[2] Ms. Petrone's final argument, that the LTD Plan abused its
discretion in determining that she does not exhibit "the complete
inability . . . to perform any job," because it never mentions a
single job for which she would be qualified, is unpersuasive.
The medical professionals and administrators of the Plan need not
indicate specific jobs to determine that Ms. Petrone is capable
of some job.  *Pari-Fasano*, 230 F.3d at 421 ("[N]o physician or
other person proceeded to speculate or investigate and report on
actual particular positions that would be appropriate for
appellant to fill, but in light of the medical evidence and in
conclusion of the reviewing physicians such a job-specific

Although the Final Determination letter arbitrarily disregards evidence of Ms. Petrone's disability, that evidence is not so overwhelming as to compel summary judgment in favor of Ms. Petrone.  The record contains significant evidence in support of both Ms. Petrone's position and that of the LTD Plan.  In this case, I deny the LTD Plan's motion for summary judgment, not because Ms. Petrone is "clearly entitled" to the benefits she seeks, but because of deficiencies in "the integrity of [the Plan's] decision making process."  *Buffonge* v. *Prudential Ins. Co. of Amer.*, 426 F.3d 20, 31 (1st Cir. 2005).  I will therefore deny Ms. Petrone's motion for summary judgment as well.

**B.   *The Administrative Rationale for Claim Denial***

The Plan also claims that it can independently deny Ms. Petrone's final appeal because she failed to "cooperate with respect to the evaluation of . . . her Total Disability."  The Plan provides that failure to cooperate with evaluation shall be grounds for terminating LTD benefits.

This provision is not buried in fine print or in some obscure section of the Plan.  Rather, the Plan repeatedly emphasizes that the claimant must cooperate with evaluations.  Reed Group also emphasized this point with Ms. Petrone in its December 16, 2008 letter, notifying Ms. Petrone of her scheduled FCE with Ms. McClusky and her IME with Dr. Saris.  The letter

---

laundry list hardly seems necessary.").

states "***[N]o benefit under this Plan shall be payable . . . [if Participant] fails or refuses to cooperate with respect to the evaluation."*** (emphasis in original).

Because the Corporate Benefits Department has the authority to "[e]xercise discretion in making determinations of fact [and] interpreting the terms of the Plan," I must uphold the Plan's decision if it is reasoned and there is substantial evidence in the record that Ms. Petrone did not cooperate with Reed Group's evaluation of her disability. *See Vlass* 244 F.3d at 30. Ultimately, I find that the LTD Plan's failure properly to engage with the evidence fatally undermines its conclusion that Ms. Petrone violated the provision of the plan requiring her to cooperate with testing.

The Administrative Record does contain some evidence that Ms. Petrone did not cooperate fully with her evaluations.  Ms. McClusky noted that Ms. Petrone exhibited "[n]o signs of maximum effort" during a "grip and pinch dynamometry" and that she demonstrated "fair effort" overall.  In response to further inquiry by Reed Group, Ms. McClusky expounded that "*at least some degree of malingering was present during today's FCE.*" (emphasis in original).  Ms. Ferguson noted that Ms. Petrone "demonstrated self limiting behavior during the lift testing."  Finally, Dr. Saris noted "one of the Waddell signs of symptom exaggeration" , I have already, of course, addressed the issues with Dr. Saris's

report above, *see supra* Section III(A)(3).  Ms. Ferguson also
noted that Ms. Petrone was "cooperative throughout testing" (*id.*
at 602), and Dr. Saris qualified his observation by saying there
was no "generalized overreaction."

The Final Determination letter expressly relies on this
evidence of self limitation in its decision, stating "[i]n
addition, and separately, no rationale has been given for Ms.
Petrone' failure to fully cooperate with both the November 2008
and November 2009 FCEs.  Therefore, Ms. Petrone is no longer
eligible for continued LTD benefits."  The Plan is entitled to
construe the meaning of "fails or refuses to cooperate" for
purposes of the agreement, at least within the appropriate bounds
of its discretion.  However, the letter does not address the
qualifications regarding Ms. Petrone's purported failure to
cooperate, including by Ms. Ferguson, Dr. Saris, and Ms. McClusky
in their reports.

Additionally, Ms. Petrone submitted a report by occupational
therapist David Bledsoe, who challenged Ms. McClusky's "casual"
use of the term "malingering," which, he asserts, is a diagnosis
defined by the DSM-IV, not an action.  He further states that a
physical therapist may be qualified to issue a differential
diagnosis, but likely not one of malingering.  The Final
Determination letter addresses Mr. Bledsoe's report on the
merits.  Indeed, it states that "Mr. Bledsoe's assessment is not

41

inconsistent with the conclusion reached by Dr. DiTullio . . . that light duty was not appropriate for Ms. Petrone, but that Ms. Petrone was capable of sedentary duty work."  But the letter fails to address Mr. Bledsoe's challenge to the suggestion of malingering by Ms. McClusky.

I find that summary judgment is not appropriate in this case on the basis of an administrative denial, where "the integrity of [the Plan's] decision making process" is in question.  *Buffonge*, 426 F.3d at 31.  To be sure, an actual malingering diagnosis is not a requirement for the Plan to deny Ms. Petrone's appeal. That she failed to cooperate - reasonably construed - with testing will suffice.  Nevertheless, the LTD Plan's systematic failure to consider contradictory evidence in the medical analyses in the record undermines its attempt to justify denial of Ms. Petrone's application for benefits for failure to cooperate.  The Final Determination letter does not address Ms. Ferguson's statement that Ms. Petrone was "cooperative throughout testing" or the fact that Dr. Saris observed only one of the various Waddell signs of symptom exaggeration.  To determine reasonably that Ms. Petrone was so uncooperative during testing as to justify denying her long term disability benefits, the LTD Plan must engage in a more reasoned and fullsome way with the evidence in the record.  Especially where the question of malingering is so central to the administrative denial for

failure to cooperate, the LTD Plan language may not be construed in such a fashion as to permit the plan to rely on the breadth of its discretion to shield it from challenges such as this where the plan administrator failed to appropriately engage with the evidence presented. *Winkler*, 170 F. App'x at 168 ("An administrator . . . may not, as MetLife did here, cherry-pick the evidence it prefers while ignoring significant evidence to the contrary.").

I recognize that a decision from the Middle District of Florida has held the Pension Committee of Johnson & Johnson did not abuse its discretion finding that another claimant violated the cooperation provisions by her failure to "put forth her best effort during the IME." *Smith* v. *Pension Comm. of Johnson & Johnson*, No. 09-cv-1042, 2010 WL 4534952, *4,*7 (M.D. Fla. Oct. 29, 2010). ("While the Court may find that the decision to terminate the LTD benefits . . . on the basis of failure to cooperate in one IME exam was harsh, it was within Defendant's rights under the Plan, did not ignore relevant information provided by Plaintiff, and was based upon reasons supported by evidence in the record.") However, in that case, the court held that the LTD Plan "did not ignore relevant information provided by Plaintiff." *Id. at* *7. The same is not true here. While the LTD Plan addressed Mr. Bledsoe's assessment, it did not address the contrary evidence in the very reports it cites in support of

43

its administrative denial.  Where, as here, a plan administrator
fails to reasonably engage with contrary evidence in the record,
summary judgment is not appropriate.

*                  *                  *

A District Court has the power to remand a case to the plan
administrator following *de novo* review where "the integrity of
[the Plan's] decision making process" is in question.  *Buffonge*,
426 F.3d at 31; *see also* 29 U.S.C. § 1132(a)(3).  Ms. Petrone is
entitled to "have the benefit of an untainted process."
*Buffonge*, 426 F.3d at 31.  I will therefore remand to the plan
administrator for further proceedings consistent with this
opinion.

## IV.   CONCLUSION

For the foregoing reasons, I DENY the LTD Plan's motion for
summary judgment (Dkt. No. 20) and Ms. Petrone's cross-motion for
summary judgment (Dkt. No. 22), and I REMAND to the plan
administrator for further proceedings consistent with this
opinion.  Defendant's motion to strike (Dkt. 34) and Plaintiff's
motion for discovery (Dkt. 27) are DENIED.

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT